**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| WALETTA JOYCE, )<br>)<br>            Plaintiff, )<br>    vs. )<br>)<br>RELIANT SERVICES, LLC, )<br>)<br>            Defendant. ) | No. 1:03-cv-1414-SEB-WTL |

**Entry Granting Motion for Summary Judgment,
Vacating Final Pretrial Conference and Jury Trial,
and Directing Entry of Final Judgment**

For the reasons explained in this Entry, the defendant's motion for summary judgment must be and is hereby **granted.**

**I.  Background**

As used in this Entry, "Joyce" refers to the plaintiff, Waletta Joyce, and "Reliant" refers to the defendant, Reliant Services, LLC.

Joyce was formerly employed by Reliant. She was hired by Reliant on July 26, 1999, and her last day of employment was November 15, 2002. Joyce alleges in this action that she was discriminated against at Reliant because of her race. Specifically, she alleges that she was subjected to a hostile environment and was discriminated against with regard to salary scale and wages paid, work assignments, promotions, disciplinary actions and termination from employment. She alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* and 42 U.S.C. § 1981. She also asserts a state law claim of intentional infliction of emotional distress. Reliant seeks resolution of Joyce's claims through the entry of summary judgment.

"Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the *Federal Rules of Civil Procedure*). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.*

## II. Discussion

**A. Findings of Fact**

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motion for summary judgment.

Reliant provides locating and meter reading services for various utility companies. Meter reading entails recording residential customers' gas usage to ensure they are accurately billed on a monthly basis. Reliant assigns employees to work at locations throughout the state of Indiana. Joyce worked in Reliant's Muncie, Indiana location.[1]

Joyce's responsibilities as a Meter Reader included driving in company vehicles and/or walking to take readings of gas meters. Each Meter Reader is assigned to at least one of five established routes. Each route consists of 21 cycles, with each cycle representing an area to be covered that day. At the beginning of their shift, Meter Readers download their routes for the day on a hand-held device called an ITRON. The ITRON provides the sequence Meter Readers should follow as they read their routes, and Meter Readers key each meter reading into the ITRON and download the information at the end of their shift.

It is important for Meter Readers not to deviate from their routes for several reasons, including to ensure workload distribution and to prevent meters from being read more than once or not at all. For example, if a Meter Reader reads a route out of sequence and another Meter Reader is needed to help with that route, it is difficult to know with accuracy where to begin to help. Meter Readers are expected to read all the meters and process the readings for the appropriate cycle for that day on the assigned route by the end of the day. After completing the cycle for the assigned route, Meter Readers are instructed to call their Team Leaders or supervisors to inform them that the routes have been completed. Once a Meter Reader completes his or her route, he or she may be relieved of any further job duties for the day or be instructed to assist other Meter Readers.

During the relevant time period, Robert Trafford ("Trafford") was the Operations Manager for the Meter Reading Division and Elizabeth Henderson ("Henderson") was the Human Resource Director. Henderson was known as Liz Swan at the time of her employment at Reliant. Trafford had overall supervisory responsibility for the Muncie office, while Henderson was responsible for Human Resources. Henderson's responsibilities included advising supervisors on personnel decisions and investigating allegations of misconduct. Trafford's responsibilities included hiring, discharge, promotions, discipline, and approving employee time off.

---

[1] Reliant is the parent company of Miller Pipeline. Miller Pipeline and Reliant are owned by Cinergy and Vectren. Despite some common ownership, Miller Pipeline and Reliant are separate companies. Joyce was an employee of Reliant and was never an employee of Miller Pipeline.

In July of 2000, Joyce received copies of Reliant's "Employee Conduct and Disciplinary Action" policy, which provides for disciplinary action, up to and including discharge for rule violations, including "Insubordination or other disrespectful conduct." She also received a copy of Reliant's problem resolution procedure through which employees can raise concerns about employment decisions that affect them. Joyce also had access to and was familiar with Reliant's Employee Handbook containing the above policies throughout her employment.

*Joyce's Compensation History*

Reliant's pay scale for Meter Readers is based on a classification system. Entry level Meter Readers start at Class I and can reach a maximum level of Class III. Meter Readers may receive a salary adjustment to either a higher or lower salary rate depending on a number of factors including performance. On July 26, 1999, Joyce began as a Class I Meter Reader making $9.00 an hour. Cinnamon Slaven ("Slaven"), a Caucasian female, was hired as a Class I Meter Reader the same day as Joyce and was initially paid $9.27 an hour. Dan Wagner and David Stover, Caucasian males, were also hired on July 26, 1999, as Meter Readers and were initially paid $10.75 and $9.27, respectively. Effective March 13, 2000, both Joyce and Slaven received a pay increase to $9.75 per hour. Joyce was the only person of African American descent employed by Reliant as a Meter Reader during the times relevant to this action.

On August 21, 2000, both Joyce and Slaven received another pay increase to $10.50 per hour. On January 1, 2001, both Joyce and Slaven were promoted from a Class I to a Class II Meter Reader with a corresponding pay increase to $10.75 per hour. On January 30, 2002, Joyce received an annual performance rating of 4.8 of a possible 5.0, and received a pay increase to $11.25 per hour. At the time of Joyce's discharge, both Joyce and Slaven earned $11.25 per hour.

*The Team Leader Position*

In late 2001, Reliant decided to create a non-supervisory position in Muncie known as the Team Leader. The person in this position is a member of the union like all other Meter Readers. Trafford had the ultimate authority to select the Team Leader. In addition to primarily performing Meter Reader duties, the Team Leader is also responsible for helping coordinate team members' work load. The Team Leader does not have any authority to hire, discharge, discipline, approve time off requests or make any decisions regarding the terms and conditions of any employee's employment. Trafford did not believe Joyce was interested in the position because she never expressed an interest in the position, although she was aware of the position. Trafford personally informed everyone at the Muncie location that there was an opening for a Team Leader position and that employees should let him know if they were interested in the position.

On November 19, 2001, Joyce wrote to Trafford stating that she was aware of the Team Leader opening and even made a suggestion regarding the interviewing process. Further, in notes she prepared and gave to Robert Fox ("Fox"), Business Agent for the

International Brotherhood of Electrical Workers ("IBEW") Local #1393, Joyce wrote: "On March 19, 2002, Dan Wagner announced they were going to interview for Team Leader. That he would start interviews that week. I declined the offer."

Pamela Foltz ("Foltz"), another Meter Reader on the Muncie team applied for and was selected for the position because she demonstrated initiative and dedication to her job. Foltz made specific suggestions as to how to improve job performance and increase productivity, she completed her job in a timely manner, she had a positive attitude towards her job, and it was Trafford's opinion that she was a team player who seemed willing to help other Meter Readers.

*Joyce's Two Day Suspension*

In July of 2002, Trafford held a meeting attended by Area Supervisor Daniel Wagner ("Wagner") (who was the immediate supervisor for the Muncie Meter Readers), Henderson, and all of the Muncie Meter Readers to address concerns about lack of teamwork and interpersonal conflicts at the Muncie location. During this meeting, Foltz, Wagner, and Joyce had a heated discussion about the issue of how, if, or when Meter Readers were supposed to help each other if one felt she was in an unsafe environment. At one point, Foltz yelled at Joyce and Joyce responded to Foltz by saying, "you need to shut your mouth" and "you're sitting too close to me to be saying that." Wagner jumped up and asked Joyce if that was a threat, and Joyce asked Wagner if he was threatening her. As a result of this exchange, Joyce received a two (2) day suspension without pay. IBEW Local #1393 filed an unfair labor practice charge with the NLRB alleging that this discipline was imposed by Reliant to retaliate against Joyce for her union activity. Reliant and the IBEW subsequently agreed that Joyce would be reimbursed for the two (2) day suspension, although Reliant disputes that Joyce's suspension was imposed for any union activity.

*Events Leading Up To Termination*

Joyce's route involved reading meters for customers in a number of towns throughout Indiana. Joyce stated in notes provided to her union representative that she had "received routes that had been established many years before we obtained them. Everyone had some good, bad, long, and short days." In her deposition, Joyce described her route as "really beneficial for me and my safety," and that she would not return to Reliant unless she was returned to the same route. Joyce also stated that there were a couple of areas/cycles that made her feel uncomfortable or unsafe because of her race, and sometimes she would call Slaven who would accompany her in those areas. Joyce was once threatened by a group of white men in a truck in Middletown, Indiana.

After Foltz became Team Leader, she reported to Trafford that Joyce frequently failed to check in before changing routes or left her route without reading all of the meters on her route. Trafford and other members of management, including Henderson, also received several reports of interpersonal problems in Muncie involving Joyce, Foltz and Slaven.

4

In October of 2002, Henderson, Trafford and union representative Fox met with Joyce, Foltz and Slaven to discuss problems in Muncie. All three employees were told to work together as a team and follow instructions. All three employees were told they were subject to disciplinary action, including discharge, if they did not follow company directions.

On November 5, 2002, Joyce failed to read 60 meters on one cycle. Joyce also left unread meters on another cycle the same day, meaning, Joyce failed to finish one cycle before starting another. On November 6, 2002, Joyce skipped 285 meters on her route because she was sick. Further, Joyce started one cycle (Cycle 10) before completing another cycle (Cycle 9). Dale Woods ("Woods"), Reliant's new Area Supervisor, who replaced Wagner as Joyce's immediate supervisor, addressed this issue with Joyce on November 8, 2002, and reinforced the requirement that Joyce finish one cycle before moving on to another one. On November 9, 2002, Joyce skipped 34 meters on her route. On November 12, 2002, Joyce skipped 104 meters. In addition to not completing her route on November 12, 2002, Joyce reported that she had worked eight (8) hours, although records kept electronically by Reliant showed that she had quit reading meters after only six (6) hours. Between November 13 and November 14, 2002, Joyce read a total of 728 meters by herself. Foltz and another Meter Reader, Natalie Lacy, read a total of 622 meters combined.

The following week, on either November 13 or 14, 2002, Woods instructed Joyce and Foltz to finish their own routes and then, if time allowed they should read Slaven's route, because Slaven was on leave. Joyce asked Woods if she could complete her own route first before working on Slaven's route. Woods responded by telling Joyce, "Yes, in fact, make sure your route is completed first and then see if time allows you to get into Cinnamon's [Slaven's] Cycle 14."

On November 13, 2002, Joyce started her route, jumped to Slaven's route and then switched back to her own route. The route reports for November 13, 2002, generated from Joyce's ITRON show that Joyce:

- started her route at 7:13 a.m.
- stopped reading her route at 10:37 a.m.
- started reading Slaven's route at 10:53 a.m.
- stopped reading Slaven's route at 11:37 a.m.
- started back on her own route at 11:46 a.m.
- stopped reading meters for the day at 1:24 p.m.

The route reports also show that Joyce read several meters out of sequence. This resulted in Foltz and Joyce duplicating their efforts by reading some meters twice. On the November 13 Skipped Meter Report she completed for that day, Joyce wrote she read until noon on her route, switched to Slaven's route and then switched back to her own route.

5

On November 14, 2002, Woods met with all the Muncie Meter Readers and directed them to contact him or Foltz once they completed their route to see if other routes needed assistance. Later that day, Woods contacted Foltz to get a status report for the day. Foltz reported that although Joyce had completed her route, she started reading Slaven's route without notifying Foltz. Foltz also stated that she and another Meter Reader did not know where to start reading meters on Slaven's route because Joyce had already started reading meters.

Foltz called Joyce at least ten times on November 14, 2002, when Foltz was trying to determine where to start reading on Slaven's route. Woods then called Joyce. Joyce said that she knew why Woods was calling her and that the manner in which she started reading Slaven's route should not have hindered any other Meter Reader. Woods then reminded Joyce that that same morning he discussed the appropriate procedure to follow when a Meter Reader finishes their route and starts on another route. Joyce responded by saying "I don't see why that's necessary" and accused Woods of micromanaging her.

On November 14, 2002, Woods sent Trafford a written memorandum detailing the incidents in November involving Joyce's performance deficiencies and her failure to follow instructions. Trafford later spoke to Woods regarding these performance issues. Woods informed Trafford that Joyce had repeatedly failed to follow his explicit directions regarding the correct procedures for working through a route, completing routes and working on other routes. Woods also informed Trafford that Joyce had claimed to work eight (8) hours one day, while the records only showed that she had worked six (6) hours and had failed to complete her route. Finally, Woods informed Trafford that Joyce had repeatedly failed to notify him or her Team Leader before switching from her route to another Meter Reader's route.

After speaking with Woods, Trafford then spoke to Henderson. Trafford and Henderson conducted an investigation of the incidents described by Woods. This investigation included reviewing a written statement from Woods, speaking with Woods, speaking with Joyce about the issues raised by Woods to get Joyce's version of events, and reviewing the data from route reports for November of 2002 for routes read by Joyce and other Meter Readers. Neither Trafford nor Henderson consulted with Foltz about the decision to terminate Joyce prior to making their decision to terminate Joyce's employment. Moreover, during the course of the investigation and in their decision-making process, neither Trafford nor Henderson could confirm that Joyce had actually contacted her Team Leader or Woods before leaving work early, abandoning her route for another meter reader's route, and skipping meters or jumbling routes.

Based on their investigation, Trafford and Henderson concluded that Joyce had been instructed as to how she should complete her route before starting another; that she had been instructed to contact her Team Leader or her supervisor before starting another route; that Woods' account of her performance issues and refusal to follow instructions was

6

credible; that Joyce failed to follow directions; that Joyce left work after only working six (6) hours and failing to complete her route, although she reported working eight (8) hours; and that her conduct warranted discharge for poor work performance and insubordination. Joyce's employment was terminated effective November 18, 2002.

Trafford initially noted in the first draft of the Personnel Action Notice that Joyce was terminated for poor performance based on the incidents in November of 2002 described by Woods and documented in Joyce's route reports. Henderson clarified the final Personnel Action Notice that Joyce was also terminated for insubordination because her poor performance was a result of her insubordination.

At the point of Joyce's termination, neither Trafford nor Henderson were aware of any other Meter Readers with Joyce's documented record of performance issues and insubordination. Moreover, at the time of the investigation and at the time of Joyce's discharge, neither Henderson nor Trafford knew nor had any reason to know of any racial animus on the part of anyone at Reliant against Joyce.[2]

## B.  Conclusions of Law

Title VII of the Civil Rights Act of 1964, as amended, prohibits "employers" from discriminating against individuals on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Section 1981 prohibits discrimination on the basis of race in the making and enforcement of contracts. 42 U.S.C. § 1981(a). A claim under § 1981 includes the same elements and employs the same analysis and methods of proof as a Title VII claim. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996).

"It is well-established that a plaintiff in a Title VII case may proceed under a direct or indirect method of proof." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004); see also *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997). The direct evidence must show that the defendant said or did something indicating discriminatory animus with regard to the

---

[2]Foltz once told Joyce that "I grew up with you people."  Joyce did not ever personally hear anyone at Reliant make racially derogatory comments in her presence with the exception of that comment by Foltz. During a meeting in September of 2005, Meter Reader Slaven heard another Meter Reader, Natalie Lacy, say something to the effect that Lacy was not afraid of those "niggs."

7

specific employment decision in question. *Id.* In short, "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers,* 320 F.3d at 753 (internal quotation omitted). "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)). "That circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'" *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003)).

Under the alternative method, in *McDonnell Douglas,* the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993). The test consists of three steps. First, the plaintiff must establish a *prima facie* case of discrimination. Second, once the *prima facie* case is established, the defendant must state a legitimate, non-discriminatory reason for the adverse employment action. Finally, if a legitimate, non-discriminatory reason is offered, the plaintiff must come forward with evidence to show that the stated reason is not the true one, but only a pretext for discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973); *DeLoach v. Infinity Broadcasting,* 164 F.3d 398, 401 (7th Cir. 1999).

Because Joyce has not provided any direct evidence of discrimination on the basis of race, she must proceed under the burden-shifting test established in *McDonnell Douglas. Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). The elements of a *prima facie* case of discrimination are: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the employer treated at least one similarly situated employee not in her protected class more favorably. *Little v. Ill. Dep''t. of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004). With respect to this last element, it is the plaintiff's burden to present admissible evidence of a specific employee outside her protected class who was treated more favorably than she, *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003), and that employee must be "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002).

*Pay Rate*

Joyce argues that she was paid at a rate less than her rank or classification since January 1, 2001. She, however, never filed a formal charge of complaint concerning her wages. As of March 13, 2000, Joyce was ranked as a Class I Meter Reader, for which the pay range was $9.00 to $11.15. There is no evidence that she was paid any less than $9.00 while working as a Class I Meter Reader. There is no admissible evidence which substantiates the pay ranges for the Class II or Class III positions. Even accepting as true Joyce's sworn statement that she was a Class III Meter Reader as of January 30, 2002, a

8

fact not substantiated by the performance review document itself, there is no admissible evidence of the range of hourly pay within that classification and what factors were considered in determining each employee's pay scale. It is clear that when an employee achieved a certain title or rank, that did not necessarily translate into a certain pay rate because there was a range of pay for each position. Moreover, the record is undisputed that from March 13, 2000, forward, Joyce and Slaven, a Caucasian female Meter Reader, were paid the same hourly rate. Joyce has not presented evidence of any employee who was directly comparable to her and did not belong to her protected class, but was treated more favorably than her with regard to pay.  Reliant is entitled to summary judgment as to Joyce's claim that she was paid less than other Meter Readers because of her race.

*Promotions*

In order to make out a *prima facie* case for a failure to promote claim, a plaintiff must show that she (1) belongs to a protected group; (2) applied for and was qualified for the position sought; (3) the defendant rejected her for the position; and (4) granted the promotion to someone who was not in the protected group who was not better qualified than the plaintiff. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003).

Joyce contends that she was overlooked for the position of Team Leader. Joyce also argues that various other employees who were hired after her were promoted to various positions.  She has not, however, presented any evidence that she applied for any particular position, including the Team Leader position, or that those who were promoted were not better qualified than her.  It is undisputed that she was aware that the Team Leader position was open and she did not make her interest, if she had any, in the position known to any Reliant officials. Joyce states that she and Slaven, a Caucasian female, were both denied an opportunity to be considered for the position. Not only would this, if true, diminish her claim that she was denied the job because of race because her Caucasian co-worker was allegedly treated the same way, but she presents no evidence as to how she was prevented from applying for the job.  Rather, she asserts that she and Slaven were given different and misleading job descriptions for the position. Even if true, this would not bar Joyce from applying for the position. Moreover, Joyce does not dispute any of the evidence showing that Reliant reasonably considered Foltz to be better qualified than the other Meter Readers for the position of Team Leader. Reliant is entitled to summary judgment as to the denial of promotion claim.

*Termination*

In a case such as this where the stated reasons for Joyce's termination of employment were poor performance and insubordination, it is not necessary to determine whether she was meeting Reliant's legitimate expectations. Rather, the analysis focuses on whether Joyce received "dissimilar - and more harsh - punishment than that received by a similarly situated employee who was outside the protected class." *Lucas v. Chicago*

*Transit Authority*, 367 F.3d 714, 728 (7th Cir. 2004) (where plaintiff claims he was subject to disparate punishment, the second and fourth prongs of *McDonnell Douglas* "merge").[3]

Joyce argues that Foltz had it "in" for Joyce and that Joyce was a "marked" employee. She contends that the fact that she received an excellent performance evaluation in January of 2002 dispels any possible explanation other than racial bias for her termination of employment 11 months later. She also asserts that the reasons offered for her termination were disingenuous.

Joyce does not allege that either of the decision-makers, Trafford or Henderson, made any racially derogatory remarks at any time during her tenure at Reliant.[4] Even if Foltz did make the remark about growing up with "you people," it is not direct evidence of discrimination because it was not made by a decision-maker nor did it concern an adverse employment action. See *Lucas*, 367 F.3d at 728, n.12; *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) ("Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decisionmaker, or those who influence the decisionmaker, and made close in time to the adverse employment decision.").

---

[3] Joyce contends that in July of 2002 when she was suspended for threatening Foltz, Foltz and Wagner both "threatened" Joyce first but neither of them was disciplined. Nonetheless, after she filed an unfair labor charge alleging that the discipline was imposed in retaliation for her union activity, Joyce was ultimately reimbursed for the two day suspension.

[4] Joyce alleges that she was treated differently by being required to obtain a doctor's statement regarding her need to wear a certain color shirt. When Joyce was hired, Meter Readers received gray shirts to wear at work. In 2000, management decided to change to orange work shirts for visibility and safety reasons. In August of 2002, Trafford observed Joyce wearing a gray work shirt. Trafford informed Joyce that she should wear the orange shirts. Trafford also instructed other employees whom he observed wearing gray shirts to wear orange shirts. Joyce told Trafford that she could not wear an orange shirt for medical reasons. Trafford asked Joyce to obtain a doctor's note to substantiate her claim that she could not wear an orange shirt. Joyce obtained a doctor's note stating that she had to wear a gray shirt for medical reasons and was then allowed to wear a gray shirt. No other employee indicated that they could not wear an orange shirt for medical reasons, and therefore no other employee was asked for medical documentation. There was no change in Joyce's pay, benefits or job responsibilities, and Joyce was not disciplined for wearing the gray shirt. No disparate treatment has been shown under these circumstances, nor was any adverse action taken.

Joyce has not presented any evidence that another employee, not in her protected class, quit reading their route, switched to another route, and then switched back without first notifying their Team Leader or other Reliant supervisor. She has also not submitted evidence that another employee reported working eight hours but worked less than eight hours and failed to finish his or her route, or that another employee engaged in conduct of comparable seriousness without being discharged. More importantly, there is no evidence that either Trafford or Henderson were aware of any employee who engaged in similar conduct.  Slaven's affidavit stating generally that "Meter Readers in the Muncie location have been known to falsify their time sheets where employees said that they worked certain hours that they had not actually worked," does not create a genuine issue of fact because it does not identify any specific individual or occasion nor does it state that she has personal knowledge that the decision-makers, Trafford and Henderson, were aware of such conduct. Slaven's statements that Foltz "several times jumped around on routes" and "left a route not calling anyone to tell them she had left leaving everyone reading the route confused," also does not create a genuine issue of fact as to whether Trafford and Henderson were aware of such actions on the part of Foltz.

Reliant has stated legitimate, non-discriminatory reasons for the termination of Joyce's employment. Trafford and Henderson were informed by Woods, Joyce's immediate supervisor, that Joyce had failed to follow his directions about completing routes and working on other routes, that she had repeatedly failed to notify him or Foltz when she switched from one route to another, and she worked fewer hours on one occasion than what she reported. Trafford and Henderson spoke with Joyce and reviewed route reports for routes read by Joyce and other Meter Readers.  They did not consult with Foltz, the person whom Joyce alleges made a racial remark to her about "you people." After their investigation, Trafford and Henderson concluded that Joyce's employment should be terminated for poor work performance. Henderson added "insubordination" as an additional basis for the termination in the final draft of the personnel notice.

To show pretext, Joyce must come forward with evidence that the stated reasons for her termination were not true reasons. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown." *Farrell v. Butler University*, 421 F.3d 609, 613 (7th Cir. 2005) (internal quotation omitted). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000). The court does "not sit as a superpersonnel department that will second guess an employer's business decision" even if that decision was baseless or mistaken, so long as the reason for the decision was honestly believed by the employer. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Joyce has not shown that Trafford and Henderson did not honestly believe the reasons given for their decision. Accordingly, Reliant is entitled to summary judgment as to Joyce's

11

disparatetreatment discrimination claims.[5]

Although Joyce references a "hostile work environment" in her Complaint, she does not frame her Title VII claim as a hostile environment claim in her Complaint nor in her brief in opposition to the motion for summary judgment. Rather, Joyce alleges that she was subjected to a hostile work environment in violation of Indiana common law and asserts a claim of intentional infliction of emotional distress. Even if alleged as a hostile environment Title VII claim, the record does not show that conditions existed which were "severe and pervasive" enough to create a hostile and abusive work environment. See *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). In addition, Joyce has not argued the elements of an intentional infliction of emotional distress claim. It is sufficient to note that Joyce has not presented evidence showing that Reliant engaged in "extreme and outrageous conduct" which intentionally or recklessly caused severe emotional distress. *Doe v. Methodist Hosp.,* 690 N.E.2d 681, 691 (Ind. 1997). Reliant is entitled to summary judgment on any hostile environment or intentional infliction of emotional distress claim.

---

[5]Prior to being employed, Joyce completed a job application which specifically asked "Have you been convicted, or served time for, a felony in the past 7 years. If so, please describe below." Joyce checked "No" indicating she had never been convicted of a felony. On or about May 9, 2005, Reliant learned that Joyce had been convicted of a felony. Reliant argues that had it known that Joyce falsified this information on her application, it would have terminated her employment immediately and that at the very least, this would diminish any damages claim that Joyce might have. Moreover, Reliant has a zero tolerance policy for falsification of records and has terminated at least one other employee, a Utility Locator, for falsifying records. At her deposition, Joyce claimed she did not recall ever being convicted of a felony. However, Joyce signed a Plea Agreement with the Marion County Prosecutor's Office on for a Class C Felony for Forgery which was filed on August 24, 1994. Joyce states she had been named in the criminal matter as a result of fraudulent conduct by her former husband and her counsel told her that if she signed a plea agreement she would not have a felony record. Joyce's claim that she was not aware of her felony conviction is not persuasive. Joyce filed a failure to hire discrimination case in 1997, *Joyce v. Ball Memorial Hospital and Lee Evans,* No. IP97-1580-C D/F. In that case, summary judgment was granted to the defendants on November 30, 1998, in part, because Joyce failed to disclose her felony conviction on her employment application for Ball Memorial Hospital. Her knowledge of the conviction was at issue in that case, prior to the time she applied for employment at Reliant. Nonetheless, because of the finding that Joyce has not established a *prima facie* case, the court need not rely on nor discuss this issue any further.

### III.  Conclusion

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *DeNovellis v. Shalala,* 124 F.3d 298, 305-06 (1st Cir. 1997) (internal quotation omitted). "Without a *prima facie* case, the plaintiff cannot withstand summary judgment." *Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir. 1993). Here, Joyce has not come forward with evidence that establishes a *prima facie* case of discrimination, nor has she shown that Reliant's proferred reasons for its actions were pretextual.

Accordingly, Reliant's motion for summary judgment must be **granted.** The final pretrial conference set for August 22, 2006, is **vacated.** The jury trial set for September 5, 2006, is also **vacated.** Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

Date: 07/24/2006

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana